DENVER & S. F. R'Y CO. v. SCHOOL DISTRICT NO. 22 IN
ARAPAHOE COUNTY.

1. A CONVEYANCE SUBJECT TO CONDITION VESTS A QUALIFIED FEE.—
   A conveyance of lots to a school district by the owner in fee, by an
   ordinary quitclaim deed, subject to the condition inserted therein,
   that the lots were to be used for school purposes, and when such
   use should cease the property should revert to the grantor, vests
   in the grantee a qualified fee, and, until the happening of the event
   which is to determine the estate granted, the grantor is divested
   of all right, title and interest in the land.

2. NO REVERSIONARY ESTATE IN GRANTOR CAPABLE OF CONVEYANCE
   UNTIL HAPPENING OF THE CONTINGENCY.— Until the happening
   of such event the grantor is not vested with an estate in reversion,
   for the contingency upon which such an estate depends may never
   happen. Having nothing to convey, therefore, if he should as-
   sume, in expectancy of a possible reverter, to execute a deed to a
   subsequent purchaser, it would not invest his grantee with any
   right or interest in the land, present or contingent, but would be
   wholly without legal force or effect; and if the second grantee
   should enter into possession of a portion of the estate under such
   a conveyance, the owner of the qualified fee could oust him there-
   from by an action of ejectment.

3. FORCIBLE ATTEMPT TO ACQUIRE RIGHT OF WAY — EJECTMENT —
   ESTOPPEL.— If a railway company without right enters upon the
   land of a citizen who is vested with the exclusive right of posses-
   sion, and attempts to construct its road-bed over the same, the
   citizen may procure its expulsion by an action of ejectment, pro-
   vided he does not acquiesce in the possession so taken, or, by af-
   firmative acts, laches or other conduct, place himself and the
   railway company in such a position as to make it inequitable for
   him to insist upon a restoration of the possession. Conduct of the
   character mentioned would limit his recovery to the value of the
   land taken.

*Appeal from District Court of Arapahoe County.*

Messrs. WELLS, McNEAL & TAYLOR, for appellant.

Mr. ENOS MILES, for appellee.

PATTISON, C.   This was an action of ejectment brought
by appellee to recover the possession of a strip of land
one hundred feet in width, being part of lots 1, 2, 3 and

4, in block 3, in the town of Petersburg. The complaint alleges ownership and the right to the possession of the property.

The answer first puts in issue the allegations of the complaint. For an affirmative defense it is alleged, in substance, that on September 15, 1880, Peter Magnus, then the owner in fee of the lots mentioned, conveyed them to appellee, upon condition that the land should be used for school purposes, and that when such use should cease the property should revert to him; that on February 15, 1887, the appellee, not desiring to use the lots longer for school purposes, asked Magnus for other lots, which he on that day conveyed; that, in consideration of such conveyance, appellee agreed to vacate the lots in question, and remove the school-house therefrom, at the close of the term then in session.

It is then alleged that Magnus, relying upon appellee's agreement to vacate the premises, on March 2, 1887, conveyed the same to David G. Peabody; that thereafter Peabody conveyed the undivided one-half of said lots to William J. McGavock; that on July 1, 1887, and after the close of the school term, Peabody and McGavock, relying upon plaintiff's good faith and intention to perform the agreement made with Magnus, gave permission to defendant to enter upon and construct its railway over the strip of land described in the complaint, which was done at a cost of over $1,000.

It is then alleged that appellant was not informed that plaintiff intended to use the lots for school purposes; that appellee had notice while the work was in progress that appellant was in possession of the land under the license given by Peabody and McGavock, and gave appellant no notice that it had or claimed any right or interest in the same; that afterwards, and on October 1, 1887, Peabody and McGavock conveyed the premises in question, with other lands, to appellant.

It is further averred that some time in September,

1887, after defendant had completed its railroad over the lots mentioned, appellee proposed to " Peabody and McGavock that, if they would convey to plaintiff, in lieu of the second aforesaid site conveyed to it by said Magnus, which had become unacceptable to plaintiff, an acceptable school-site, plaintiff would forthwith remove its school-house thither, and would convey said site conveyed to it by said Magnus to said Peabody and McGavock; and that said Peabody and McGavock offered to plaintiff, and plaintiff accepted, for its school-site, lots 1, 2, 3 and 4, in block 13, of said Englewood, situate in the said school district of plaintiff; and said McGavock being then absent from the state, and unable to join in the conveyance of the said last-named lots, plaintiff requested said Peabody to execute to plaintiff, and said Peabody did, to wit, on the 8th day of September, 1887, execute to plaintiff, his written agreement to convey jointly with said McGavock, upon his return to Denver, the said last-named lots to plaintiff, in consideration of $1 and the removal of plaintiff's school-house; that plaintiff, in disregard of its aforesaid promises and agreements, and after said last-mentioned agreement, wrongfully re-entered upon the lots described in the complaint, and wrongfully re-opened its school in said school-house," etc.

No more of the answer need be recited. The affirmative defenses were put in issue by the replication, and upon the issues thus formed a trial was had, which resulted in a judgment for the appellee for possession of the premises.

The evidence tends to show that on September 15, 1880, Peter Magnus conveyed the premises above described, by quitclaim deed in the usual form, to the appellee. The deed contains the following covenant: " It is hereby agreed that the said above-described property is to be used for school purposes, and that, whenever it shall cease to be so used, the said property shall revert to the grantor herein, his heirs and assigns, and this said agree-

ment is hereby declared to be a covenant running with the said lots."

The premises had been occupied for school purposes prior to the execution and delivery of the deed, and were so occupied after the deed was made, and at the time the action was brought. Some time in the year 1886 some steps appear to have been taken to locate the school-house in some other part of the district. In that year Peter Magnus conveyed a tract of land, called the "Public Square in Petersburg," to the school district, for use in lieu of the premises in question. Under what circumstances this conveyance was made does not appear. The premises were never occupied by appellee for any purpose. The minutes of the meetings of appellee, which were introduced in evidence by appellant, show that on May 16, 1887, at an adjourned meeting of the school district, the question whether the school-house should be located in the center of the district, or in the public square of Petersburg, was voted upon. "The highest number of votes carried it to the center; being ten for, and six against." At the same meeting a committee was appointed, consisting of Thomas Skerrit, R. M. St. Clair and Adolph Candler, to locate the school-house site as near the center of the district as practicable.

On May 26, 1887, at a meeting of the school district, R. M. St. Clair was elected a director or trustee in place of Thomas Skerrit. The board then consisted of Robert M. St. Clair, Adolph Candler and Thomas Lockhart. March 2, 1887, Magnus conveyed the premises in question, with other lands, to Peabody. After the appointment of the committee to select a school-site, Skerrit, as one of that committee, had some talk with Peabody about another site for the school-house, which resulted in an agreement for the conveyance of other lots, but the precise terms of that agreement nowhere appear. The negotiations between Skerrit and Peabody seem to have taken place some time in June, 1887. No one of

the school directors took any part in the matter. Whether Skerrit reported the negotiations and agreement is not disclosed. The agreement was never acted upon by appellee in any way, and no conveyance of the lots selected was ever made by Peabody pursuant to the agreement. Immediately after the negotiations between Peabody and Skerrit, Peabody gave permission to appellant to construct its railway over the premises in controversy. This permission seems to have been given with the understanding that the school-house was to be removed, but no agreement to that effect had been made by any one having authority to represent the appellee. Neither does it appear that any one of the school trustees had notice that such an agreement had been made, or that permission had been given by Peabody to appellant to enter upon the premises.

Some time in July or August, but at what time the record does not clearly disclose, the employees of appellant entered upon the premises and began work. Very soon after entry was made, at an informal meeting, the school trustees named determined to take the steps necessary to protect the property. Lockhart went to Denver, and called upon Manning, the right of way agent, to ascertain by what right appellant had taken possession of the property. The interview with Manning resulted in nothing except the assertion by him of a claim of right under Peabody, and a promise to meet the school trustees at the school-house, upon a day named, to adjust the matter. Manning failed to keep the engagement, and thereupon a wire fence was built about the premises. When the contractors came to lay the ties and iron, they were notified not to enter upon the land. The notice was disregarded, the fence was torn down, the grading completed, and the ties and iron laid.

Before this suit was brought, another attempt appears to have been made by appellee to adjust the difference and avoid litigation. The trustees visited Manning again.

They were willing to accept other lots from Peabody,. but they declined to surrender possession of the land in question unless the expense of removing the schoolhouse was paid in advance. Manning refused to advance the sum of $225, which was the sum demanded, but undertook to pay for removing the building after the work had been done. The proposition was not satisfactory to appellee, and it refused to accept it.

The first question to be determined is whether the license given by Peabody to appellant to enter upon the land in controversy conferred any right of entry, and whether the deed subsequently made by Peabody and McGavock vested appellant with any interest in the premises whatever.

The legal effect of the deed first made by Magnus to appellee is clearly apparent. It was in form an ordinary quitclaim deed, and divested the grantor of all his right, title and interest in the land. The covenant providing that, when the premises should be no longer used for school purposes, the title should revert to the grantor, was clearly a limitation. The title conveyed, therefore, was a qualified fee. Whenever the event might occur upon which the limitation was based, the estate of appellee would immediately cease. Nevertheless, until the happening of that event, appellee had the same right in, and the same dominion over, the estate that it would have had had there been no limitation whatsoever. " Yet while the estate continues, and until the qualification upon which it is limited is at an end, the grantee has the same rights and privileges over his estate as if it were a fee-simple." *State v. Brown*, 27 N. J. Law, 13, 20, and authorities cited; Tied. Real Prop. §§ 44, 281.

As Magnus had conveyed his entire estate, it is clear that nothing remained to him which he could convey to Peabody, unless the limitation was such as to leave him vested with an estate in reversion which could be the subject of grant. Such reversion could not exist, how-

·ever, unless, from the nature of the limitation, it appears that the event upon which it was based, in the nature of things, must happen.   That event was the abandonment ·of the use of the premises for school purposes.   It is manifest that such an event might never occur.   The premises might always be used for the purpose for which they were conveyed.   This being true, Magnus was not vested with a reversion, or an estate in reversion, and there was nothing left to him save the mere " possibility of a reverter."   No interest in the estate, therefore, could pass by his deed to Peabody, and, as a matter of course, as Peabody took nothing he could convey nothing, either to McGavock or to the appellant.   Whether these deeds might not operate as an assignment of the reversion or the possibility of reverter it is unnecessary to determine. It is sufficient to say that they did not convey the title or vest the  grantees named in them with any right or interest, either present or contingent, in the body of the land itself.   Tied. Real Prop. § 385; 2 Washb. Real Prop. 739.

It follows, therefore, that Peabody was without authority to grant the license under which entry was made; that his conveyance was without legal force or effect; and that appellant took possession of the premises without right.

When appellant entered upon the land, the title in fee, and the exclusive right of possession, was vested in appellee.   The right of appellee to maintain ejectment, therefore, was perfect.   That right was not lost, unless the conduct of its officers in the premises was such that equity and good conscience would require that the value of the land be sued for instead of the land itself.   In other words, the right could not be lost except by estoppel or acquiescence in the taking.

It is undoubtedly true, when a railway company enters upon the land of a citizen, even though such entry be ·without right, and constructs thereon its road-bed, that·

after the railway is finished and is being used by the railway company in the conduct of its business as a common carrier, and in the discharge of its duties to the public, the land-owner will not be permitted to maintain ejectment, but will be limited to a recovery of the value of the land, if it appears either that he has actually acquiesced in the possession of the railway company, or that by affirmative acts, laches or other conduct he has placed himself and the railway company in such a position as to make it inequitable for him to insist upon restoration of the possession of the land. But, to maintain such a defense to the action of ejectment, the evidence must be clear and decisive. It must appear that the land-owner did actually acquiesce either in the entry or in the occupation of his property. If this does not appear; if, on the contrary, the entry was made without the consent of the owner; if he has at all times used reasonable diligence to protect his property,— then the defense of estoppel or acquiescence cannot prevail. The theory that a man may be deprived of his property for public use, by the operation of an estoppel, or by acquiescence, is based upon considerations of the interest of the public at large.

Although the interests of the public are always entitled to serious consideration, yet the taking of property for public use, without right, cannot be justified, nor will the owner be restricted to compensation and damages, when he has at all times insisted upon his rights in the premises, and has applied to the courts for protection with reasonable diligence. Lewis, Em. Dom. § 648; .Mills, Em. Dom. (2d ed.) §§ 140, 141; *Pickert v. Railway Co.* 25 N. J. Eq. 316; *McAulay v. Railway Co.* 33 Vt. 311; *Railway Co. v. Allen,* 113 Ind. 581; *Railroad Co. v. Soltweddle,* 36 Amer. & Eng. R. R. Cases, 577.

In this case there is no evidence upon which an estoppel can be predicated, or from which acquiescence can be inferred. In June, 1887, when Peabody assumed au-

thority to grant the license to appellant to enter upon the premises, he was without right or interest in the land. When appellant entered upon the land, appellee took the steps deemed necessary to protect the property.   The officers visited Manning, only to be told by him that he had a right of way from Peabody, and that he would meet them at a future day.   When he failed to do this, the property was fenced.   From the beginning to the end of the transaction, the attitude of appellee was that of protest, and never that of acquiescence.   When the road-bed was completed, Manning was again visited, and told the terms upon which appellee would yield its rights in the premises.   These terms he refused to accept.   Appellee then brought this action, which it had an undoubted right to do.   The judgment is affirmed.

RICHMOND and REED, CC., concur.

PER CURIAM.   For the reasons stated in the foregoing opinion the judgment is affirmed.

*Affirmed.*

MR. JUSTICE ELLIOTT not sitting.