# January Term, 1911.

[No. 5588.]
[No. 3266 C. A.]

## Chicago, Rock Island & Pacific Railway Company v. Hayes.

1. **Dedication of Lands to Public Use**—The dedication of lands to a public use will not be inferred from equivocal or ambiguous acts or declarations of the landowner. His intention to devote his property to the public use must clearly appear. —(341)

Plaintiff was solicited to give a way through his lands to a railway company, and consented. The width was not stipulated. After the railway had been constructed and operated for at least two years, he executed a deed granting a way of 100 feet in width. Later he subdivided the land into lots and blocks, and caused a plat of the subdivision to be recorded, setting down therein the track of the railway, with an unplatted space upon each side of it. There was nothing to show why this space was not subdivided, or to what use it was devoted. Held, that no dedication was to be inferred, from these features of the plat, nor from the erection by plaintiff of a fence along the line of the unplatted strips, to mark the lines of the blocks.—(341, 342)

2. **Estoppel by Conduct**—To an action of ejectment against a railway company to oust it from land occupied by its roadbed, the defense of estoppel by acquiescence of the landowner may in a proper case be interposed. But it must be made to appear that he actually acquiesced in the construction of the railway, or that by reason of his affirmative acts, laches or conduct, it is inequitable that he should insist upon restoration of the possession. The defense is based upon considerations of the interest of the public; and the landowner will not be restricted to compensation where he has at all times insisted upon his right, and applied to the courts, with reasonable diligence.—(343-346)

Plaintiff in 1891 conveyed to defendant a way for its railroad 100 feet in width. In 1894, the defendant erected fences upon each side of its railway 100 feet distant from the center line. For eight or nine years thereafter the defendant occupied the way granted, without otherwise passing the limits of the grant.

It then began to excavate for gravel and continued this excavation beyond the bounds of the grant, using the gravel to improve other portions of its road. Plaintiff, as soon as informed of this, protested, and continued his protests, until advised by the defendant that it claimed a way of 200 feet in width, when he instituted an action of ejectment. Held, that plaintiff was entitled to recover possession and damages.—(348)

3. Evidence—Measure of Proof Required—To estop a landowner from the recovery of his lands, by mere acquiescence in the construction of a railway thereon, the evidence must be clear and decisive.—(346)

4. Pleading—What Must Be Specially Pleaded—An estoppel in pais must be specially pleaded.—(343)

5. Appeals—What May Be Assigned for Error—A judgment injurious and erroneous only as to the successful party cannot be assigned for error by his adversary.—(348)

*Appeal from El Paso District Court*—Hon. LOUIS W. CUNNINGHAM, Judge.

Mr. M. B. HURLEY, Mr. M. A. LOW, Mr. PAUL E. WALKER and Messrs. SHEAFOR & KINNEY for appellant.

Mr. HENRY C. HALL and Mr. WALTER SCOTT for appellee.

Mr. JUSTICE MUSSER delivered the opinion of the court:

About the year 1888, the board of trade of the city of Colorado Springs, to induce the building of a new railroad, undertook to obtain, for the Chicago, Rock Island & Colorado Railway Company, soon succeeded by the Chicago, Kansas & Nebraska Railway Company, a right-of-way in and near the city. J. A. Hayes, the plaintiff, and two others, owned a tract of ground just north of the corporate limits, over which it was proposed to run the road. Mr. D. B. Fairley, on behalf of the board of trade, negotiated with Mr. Hayes for a right-of-way over this ground. Mr. Hayes told Mr. Fairley that he and his co-

owners would give the company a right-of-way over their land, with the understanding that there should be no cuts or embankments thereon. Later it was learned that a cut would be necessary, and Mr. Hayes was so informed. Finally, Mr. Hayes said that a right-of-way would be given and the cut permitted, provided that no embankments were thrown up. The company desired a right-of-way 200 feet wide. Mr. Fairley testified that, while he had 200 feet in mind, he would not say that width or any width was ever mentioned to Mr. Hayes. Mr. Hayes testified that no width was ever mentioned. The right-of-way on either side of plaintiff's land was 200 feet wide. The plan of the board of trade was to secure money enough by subscriptions from the residents of Colorado Springs to purchase the right-of-way necessary in and near that city. Mr. Hayes, for himself and co-owners, made a subscription of $500.00, and it was understood, either at the time it was made or soon thereafter, that this subscription should not be paid in money, but would be considered paid by the right-of-way given. Afterwards the railroad company entered upon the land of the plaintiff and constructed thereon a single track road, which appears to have been completed and in operation about the year 1888 or 1889, and since its construction it has been continuously operated. After the cut was made and the road built, Mr. Hayes ascertained that the company had thrown up an embankment near the cut to keep out water which might accumulate from lands above. He made objection to this embankment, and refused to give any deed for the right-of-way until that matter was adjusted. Later on, the defendant succeeded to all the rights of the Chicago, Kansas & Nebraska Railway Company. The dispute relative to the embankment continued until about October, 1891. At that time the president of

the defendant company came to Colorado Springs, and he and a civil engineer connected with the company, and Mr. Hayes, went upon the ground to look over the situation. The result of this conference was that a written agreement was entered into between Mr. Hayes and his co-owners, and the defendant, by its president, wherein it was recited that a certain deed, bearing even date with the agreement, to wit, October 17, 1891, was executed and put in escrow by Mr. Hayes and his co-owners, conveying to the Chicago, Kansas & Nebraska Railway Company a strip of land 100 feet in width, being 50 feet in width on each side of the center line of the railroad as then constructed and operated, and upon the performance, by the company, of certain things relative to the embankment and other matters mentioned in the agreement, the deed should be delivered to the company. The embankment was referred to in the agreement as upon the land deeded, and the company agreed to reduce this to a height of two feet, round it off, slope it smoothly to the surface, and keep it so. The embankment was thus confined to the land deeded. The company performed what it was to do under the agreement, whereupon the deed, conveying the 100-foot strip, was delivered to it, and recorded about November, 1892.

On March 2, 1889, Mr. Hayes and his co-owners caused to be filed in the recorder's office a plat of North Colorado Springs, executed by them, showing lots, blocks, streets and alleys north and south of the railroad. Within this plat was an unplatted space, in the center of which appeared two lines, about 1-32 of an inch apart, between which there appears, on the blue print in evidence, alternate white and blue spaces, about ⅛ of an inch long, as railroad tracks are usually designated on plats. Along this narrow track appears, in one place, the letters "C. K. & N.

Ry.'', and on one side of the plat, on each side of the railroad track, appear the figures ''100,'' and on the other side of the plat, on each side of the railroad track, appear the figures ''125.'' These figures indicate the width of the unplatted space, which was bounded on its northerly and southerly sides by the lines indicating the boundaries of blocks, though these lines are continuous across the streets and alleys, and indicate the boundaries of the platted portion.

On August 5, 1890, Mr. Hayes and his co-owners filed a plat, executed by them, vacating the portion of the plat of North Colorado Springs lying south of the railroad. This plat showed the unplatted space the same as the previous plat, except that along the narrow railroad track appeared the words, ''Chicago, Rock Island & Pacific Ry.'', and on the same day another plat was filed, showing that the portion that had been vacated was replatted as North End Addition No. 3 to the city of Colorado Springs, and showing the unplatted space as before, with the words, ''Chicago, Rock Island & Pacific Ry.'' along the narrow line of the track. Nothing more appears on the unplatted space to indicate what it was designed for. The defendant drew out, on cross-examination, the fact that the unplatted strip was made the width indicated in order to remove the platted lots farther from the railroad cut, as a protection to the lots. After the first plat was filed, Mr. Hayes caused fences to be constructed around the blocks, and fences were built along the northerly and southerly sides of the unplatted portion about 100 feet distant from the center line of the railway track. These fences were built for the purpose of showing the blocks as platted. The testimony is, that in the lapse of time, these fences fell, and, in about 1894, the railway company rebuilt the fences on either side, approxi-

(22)

mately 100 feet from the center line of the track. The cut, as originally constructed over the land, was about 25 feet deep and less than 100 feet wide at the top; that is, less than 50 feet wide on either side of the track. The ground on either side of the cut was a gravel-bed. The record indicates that, about the year 1897, the company began digging this gravel from the sides of the cut and used it along its line for ballast and concrete work. It continued to so remove this gravel until, at the time of the trial, the testimony shows that it had removed 1,730 cubic yards from the 50-foot strip immediately north of the 100-foot strip that had been deeded to it, and 7,270 cubic yards from the 50-foot strip immediately south of the deeded strip. The evidence was, that this gravel was worth from ten to twenty-five cents a cubic yard, during the six years before the trial.

About the year 1897, the cut first appeared to Mr. Hayes to be more than 100 feet in width, and he and his co-owners caused an examination to be made by a civil engineer, who, in January, 1898, reported to Mr. Hayes that the railroad company had widened the cut, and that it was then from 100 to 120 feet wide. Mr. Hayes at once informed the servants of the railroad company, in charge, that they had gone beyond the company's lines and must not excavate any more in the cut. Excavation ceased for a while, to be later resumed. Mr. Hayes continued protesting, and endeavored to bring about a cessation and adjustment of what he claimed was a trespass upon the land, and finally, in October, 1901, he was informed by a letter from the vice-president of the defendant company, that the railroad claimed a right-of-way 200 feet wide and the right to remove the earth to that width, and suggested that the best way to settle the controversy was through the courts.

In August, 1903, this action was commenced to

recover the possession of the 50-foot strip lying north of and along the 100-foot strip, which had been deeded, and the 50-foot strip lying south of and along the deeded strip, and to recover damages for the detention of the premises and the removal of the gravel therefrom. The plaintiff was the owner of an undivided one-third interest, and his co-owners are not parties to this action. The company, in its answer, denied, in substance, the plaintiff's ownership, and right to possession of the land in controversy. The answer further contained an affirmative defense, setting out the recordation of the plats above mentioned, and alleging that thereby the owners had dedicated and conveyed to the public and to the company the premises afterwards deeded, as well as the premises in controversy—in all, 200 feet—as a right-of-way. The defense also alleges that, in 1888, Mr. Hayes and his co-owners subscribed in writing and thereby promised to pay $500.00 to the Chicago, Rock Island & Colorado Railway Company, to aid it in the construction of the proposed railroad; that, at the time it was agreed that the subscribers should have the right to pay their subscription by the conveyance of a right-of-way, and that, in consideration of being released from said subscription, the owners did agree to convey, as a right-of-way, the premises in controversy, as well as the premises afterwards conveyed by deed—in all, 200 feet in width; that the Chicago, Kansas & Nebraska Railway Company succeeded to all the rights of the Chicago, Rock Island & Colorado Railway Company in and to said subscription, and said premises, and that the defendant company succeeded to all the rights of the Chicago, Kansas & Nebraska Railway Company therein; that immediately upon the cancellation of said subscription, in consideration of said right-of-way of 200 feet, the railroad company took possession of the premises and

constructed a line of railway thereon; and that, ever since March, 1888, the defendant and its grantor have been in the absolute, exclusive and undisturbed possession of the right-of-way of 200 feet, constructing, maintaining and operating thereon its line of railway. The answer further sets out that, when the deed of October 17, 1891, was executed and delivered, there was omitted, inadvertently, the premises in controversy. But it is not alleged that the plaintiff and his co-owners intended to convey the premises in controversy in addition to the 100 feet that was conveyed. This allegation with respect to a mistake in the deed may be dismissed with the remark that there was no evidence whatever to show that it was a mistake. On the contrary, the evidence showed that the agreement entered into in October, 1891, as well as the deed which was put in escrow and later delivered, were prepared by the attorney of the defendant company, brought to the plaintiff for execution and were executed as so prepared. With regard to the matter of the $500.00 subscription, it appears, from the evidence of Mr. Fairley, who was a witness for the defendant, that this subscription was not made to the railroad company, but to the board of trade. He represented the board, and not the railroad company. His testimony is:

"We (the board of trade) agreed or undertook to furnish that right-of-way first by raising the amount of money necessary that we thought to pay for it, by public subscription, and then to buy this land from the individuals and pay for it out of the funds raised by public subscription."

And he further testified that plaintiff and his co-owners agreed to give the right-of-way in lieu of paying the money. Mr. Fairley and Mr. Hayes were the only parties to these negotiations, and as Mr. Fairley said that he would not testify that the width

of the right-of-way was or was not ever mentioned to Mr. Hayes, and Mr. Hayes testified positively that it was never mentioned, it is clear, from this record, that the minds of the parties never met relative to the width of the right-of-way that was wanted or intended to be given. If we assume that a railroad company can take, by dedication, in this state, a proposition which the plaintiff denies, the authorities do not support the claim of the defendant that a dedication of a 200-foot strip was made by the filing of the plats mentioned. The general conclusions of the various courts are stated in 9 Ency. of Law, p. 60 (2nd ed.), thus:

"To show a dedication, it should clearly appear that the owner intended to give the land to the public. It is not sufficient that some private use is not shown; and no presumption that the owner intended to deprive himself of his land can be relied upon to explain any ambiguities or uncertainties. The particular use for which the land was intended must plainly appear."

It is true that the particular use for which the land was intended does not plainly appear on these plats, and that no private use is shown. These very omissions are against the theory of dedication, under the law announced. The plats may be uncertain as to what was intended to be done with this strip, but that uncertainty does not afford even a presumption that the owners intended to deprive themselves of it. There are no words upon the plats to indicate what the strip was for. In the case of *Morgan v. Chicago & A. R. R. Co.*, 96 U. S. 716, cited by defendant, the plat showed a strip marked "depot," and this, together with other facts, governed the court, and, in *K. C. & N. C. Ry. Co. v. Baker*, 183 Mo. 312, also cited by defendant, the ground was marked on the plat, "Reserved for Depot Grounds."

On the plats in this case, nothing appears except the name of the railroad along the narrow track, and this merely shows what was visible to the eye on the ground. The observations of the court in *Ritchie v. K. N. & D. Ry. Co.*, 55 Kan. 36, where more was shown on the plat than in the present instance, are applicable here:

"While the streets and alleys are expressly dedicated to public uses, there is nothing written on the plats indicating a purpose to dedicate any lands to railroad uses. All that can be said in any way to indicate such a purpose is the fact that the location of the tracks and buildings are marked on the plat. We think this could be done with perfect safety and propriety, because the tracks and buildings were already there, and the plats merely show what was visible to the eye on the ground, and their locations with reference to the balance of the property."

Beyond all the foregoing, exists the fact that, in October, 1891, after the road had been in operation at least two years, and after a personal visit to the ground by the president of defendant, accompanied by one of its civil engineers and plaintff, an agreement in writing was entered into respecting the matters under consideration, embracing the deed to be given, the embankment and other matters, and a deed was executed pursuant to that agreement, which, in due time, was delivered and accepted, fixing definitely and beyond question the width of the right-of-way at 100 feet; that is, 50 feet on each side of the center line of the track as then constructed. No citation of authorities is necessary to show that all previous negotiations, disputes and unsettled matters embraced in the contract and deed were merged into, defined and settled thereby. The same matters, occurring prior to the delivery and acceptance of the

deed, now urged by defendant to show its right to the ground in controversy, would as well show its right to the ground conveyed by the deed, and if the rights of the defendant to the ground in controversy are now put upon the grounds urged, the written contract and the deed will appear to have been for naught.    Notwithstanding the fact that the width of the right-of-way was fixed by the contract of the parties, defendant urges the application of the doctrine that a landowner is estopped by his acquiescence in the building and operation of a railroad over his land, from maintaining an action of ejectment to recover the land over which the railroad runs, and cites:    *Roberts v. Railroad Co.*, 158 U. S. 1; *Pryzbylowicz v. Mo. River R. Co.*, 17 Fed. 492; *Baker v. C., R. I. & P. R. R.*, 57 Mo. 265; *Provolt v. C., R. I. & P. R. R.*, 57 Mo. 256; *Ind., etc., Ry. Co. v. Allen*, 113 Ind. 581; *L. N. A. & C. Ry. Co. v. Soltweddle*, 116 Ind. 257, and many others.

It is doubtful if such a defense is set up in the answer.    It is the settled law of this state that, to establish an estoppel *in pais*, it must be specially pleaded.—*De Votie v. McGerr*, 15 Colo. 467; *Gaynor v. Clements*, 16 Colo. 209; *Davidson v. Jennings*, 27 Colo. 187.

If, however, such a defense has been properly pleaded, it cannot avail in this instance.

In all of the cases cited by defendant, if the action of ejectment had been permitted to go on, the result would have been a severance of the line of railroad, a suspension of its operation and an interruption of the service to the public.    In line with these cases this court, in *D. & S. F. Ry. Co. v. School District*, 14 Colo. 327, has already recognized that, under proper circumstances, a defense of estoppel by acquiescence may be maintained to an action of ejectment against a railroad company, wherein it is

sought to oust the company from the land occupied by its roadbed. But the theory of such a defense is based by the court upon considerations of the interest of the public. In that case, beginning on page 333, this court said:

"It is undoubtedly true, when a railway company enters upon the land of a citizen, even though such entry be without right, and constructs thereon its roadbed, that, after the railway is finished and is being used by the railway company in the conduct of its business as a common carrier, and in the discharge of its duties to the public, the landowner will not be permitted to maintain ejectment, but will be limited to a recovery of the value of the land, if it appears either that he has actually acquiesced in the possession of the railway company, or that, by affirmative acts, laches or other conduct, he has placed himself and the railway company in such a position as to make it inequitable for him to insist upon restoration of the possession of the land.  *  *  *  The theory that a man may be deprived of his property for public use, by the operation of an estoppel, or by acquiescence, is based upon considerations of the interest of the public at large."

In that case, this court evidently adopted the theories of the Indiana cases mentioned above, for it cites them in the opinion, and also the case of *McAulay v. Railroad Company*, 33 Vt. 311. In *Railway Company v. Allen, supra,* the Supreme Court of Indiana said:

"What we affirm is, that acquiescence after public rights have intervened, will prevent a landowner from destroying the line of road by wresting possession of a part of it from the company. This principle does not rest upon the right of the railroad corporation so much as upon considerations of public policy."

The right of an owner of property to at all times defend it in a court from an unlawful seizure, and to recover it in an action, when unlawfully seized, is too well grounded to permit an abridgment of that right in such a case as this, to extend beyond limits already set by this court. Following the path blazed out, it must be first ascertained if any interest of the public will be contravened if the plaintiff is permitted to recover in this case. For a period of about eight or nine years, from 1888 or 1889 to about 1897, the defendant performed its duty to the public as a carrier of freight, passengers and mail, without going beyond the right-of-way fixed by itself in accepting the deed for 100 feet. So far as this record shows, it was in 1897 that it first went beyond the limits fixed by the deed, and began excavating upon the land in controversy. It did not then go upon the ground in order that it might perform its duty as a common carrier, but to obtain gravel to be used elsewhere upon its line. True, about 1894 it built fences at the outward limits of the 200-foot strip, enclosing the ground in controversy with the deeded strip. But the public would have been served equally as well if the fences had been built at the outward boundaries of the 100-foot strip that had been deeded. So far as the public is concerned, it was served as well before the gravel was taken as it has been since, and there is nothing in the record to indicate that the service of the defendant to the public would be at all interrupted, or affected, if plaintiff was permitted to oust the defendant from the ground in controversy. The defendant would still retain the 100 feet deeded to it, in the center of which is laid its track, over which it has operated its road since the time of its construction. Nor can it be said that the plaintiff, in any manner, induced the defendant

to expend any money or make any improvements upon the land in controversy, for no money whatever has been expended or improvements made thereon.

In the 14th Colo., it is further said, on page 334:

"Although the interests of the public are always entitled to serious consideration, yet the taking of property for public use, without right, cannot be justified, nor will the owner be restricted to compensation and damages, when he has at all times insisted upon his rights in the premises and has applied to the courts for protection with reasonable diligence."

And in that case, it was held that the owner had, at all times, insisted on its rights and its attitude was that of protest, and never that of acquiescence, and the very roadbed was recovered in ejectment. It is further said in that case that, to maintain a defense of estoppel by acquiescence to an action of ejectment, the evidence of acquiescence must be clear and decisive. As soon as it became apparent that the defendant in this case was excavating upon the land in controversy, the plaintiff objected, ordered that the trespass cease, and took the matter up with the officers of the company for adjustment, and finally began this action before any interest of the public had intervened, and, in fact, under circumstances in which the public could have no interest at all, as has been seen. From the beginning to the end of the transaction, the attitude of the plaintiff was that of protest, if protest was necessary in this case.

From the foregoing, it follows that the plaintiff was entitled to recover proper damages and possession of the land in controversy. Over the objections of plaintiff, the defendant was permitted to put in evidence as to the width necessary in order to conveniently set telegraph poles and to afford such a

width for the cut that the wash and water might be more conveniently taken care of. In order to admit this evidence, the defendant was permitted to amend its answer by interlineation. This width was variously estimated by different witnesses at from about 100 to 155 feet. In the instructions, the court, in substance, told the jury that, if all the land in controversy was reasonably necessary to the proper operation of the line of railroad, their verdict should be for the defendant, and that the plaintiff could recover only such portion thereof as was not so reasonably necessary, together with damages, if any, upon the land taken by the defendant and not necessary for the operation of the road, regardless of the contract and deed, or of any consideration of the rights of the public, or of any question of estoppel by acquiescence of the plaintiff. The damages were specially confined to the portion of the land not reasonably necessary for the proper operation of the railroad, and the court based the rights of the parties solely upon this necessity; whereupon the jury returned a verdict that 10 feet along the northerly side of the northerly 50 feet and 40 feet along the southerly side of the southerly 50 feet was not so reasonably necessary, and that the plaintiff was the owner of an undivided one-third interest therein and entitled to the possession thereof, together with $1,200.00 damages for its detention, and the judgment was for recovery of the said northerly 10 feet and the southerly 40 feet, together with $400.00 damages, there having been a remission of all the damages in excess of $400.00.

As has been seen, it is the declared law of this state that the unlawful entry upon land by a railroad company for right-of-way can only be justified upon consideration of the interest of the public after the

roadbed is constructed and is being used in the business of a common carrier, and then only when the owner, by the most clear and decisive evidence, appears to be estopped from recovering his land by acquiescence. To say that one who unlawfully occupies the land of another may hold that land against the owner simply because it may enable such occupier to more conveniently carry on his business, is clearly error. There may be instances when the state may enter upon and take private property without the consent of the owner, and without resort to the statutes of eminent domain, and be justified by so doing on the ground of overwhelming necessity; but nothing except the consent of the owner or proceedings under the statutes of eminent domain will justify the entry upon and taking of private property by individuals or corporations, beyond the limits already set by this court. The defendant, in this case, was permitted to retain a portion of the property in controversy which it was not entitled to retain, and it is certain that the plaintiff has not recovered or received the value of the land so retained, nor any damages occasioned to his adjacent land on account of the taking thereof by the defendant, which value and damages he might recover in a condemnation suit. There is error in the instructions of the court, the verdict of the jury, and the judgment. The error, however, is against the plaintiff, and not against the defendant. The plaintiff is not here complaining. He is here endeavoring to sustain the judgment, and it will, therefore, be affirmed.          *Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE BAILEY concur.

Decided March 7, A. D. 1910; rehearing denied February 6, A. D. 1911.